IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PUEBLO OF SANTA ANA and
TAMAYA ENTERPRISES, INC.,

    **Plaintiffs,**

  **v.**               CIV No. 11-957 LH/LFG

HONORABLE NAN G. NASH, District
Judge, New Mexico Second Judicial,
Division XVII, in her Individual and Official
Capacities;  GINA MENDOZA, as Personal
Representative under the Wrongful Death Act
of Michael Mendoza, Deceased;  F. MICHAEL
HART, as Personal Representative under the
Wrongful Death Act of Desiree Mendoza, Deceased;
and, DOMINIC MONTOYA,

    **Defendants.**

<u>**MEMORANDUM OPINION AND ORDER**</u>

  **THIS MATTER** comes before the Court for consideration of Plaintiffs' Motion for Summary Judgment (ECF No. 52) and Defendant Mendozas' Second Motion for Summary Judgment (ECF No. 73).  The Court, having considered the motions, all related briefs and exhibits, and being otherwise fully advised, concludes that Plaintiffs' Motion for Summary Judgment is **granted in part and denied in part,** and that Defendant Mendozas' Second Motion for Summary Judgment is **denied**.  Specifically, the Court hereby enters a declaration that the Indian Gaming Regulatory Act, 25 U.S.C. § 2701, *et seq.* ("IGRA") does not authorize an allocation of jurisdiction from tribal court to state court over a personal injury claim arising from

the allegedly negligent serving of alcohol on Indian land, and further that the New Mexico State District Court does not have jurisdiction in the case of *Gina Mendoza, Michael Hart and Dominic Montoya v. Tamaya Enterprises, Inc*., *d/b/a Santa Ana Star Casino*, CIV 2007-005711 ("underlying state court litigation").

## I.  Allegations of the Complaint Filed in Federal Court

The Complaint in this matter (ECF No. 1) asserts federal jurisdiction pursuant to 28 U.S.C. §§ 1331, 1362 and 1343.  It seeks injunctive and declaratory relief, pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201.   Specifically, Plaintiffs Pueblo of Santa Ana and Tamaya Enterprises, Inc. (collectively referred to as "Pueblo Plaintiffs" or "the Pueblo") seek:  (1) an order prohibiting New Mexico District Court Judge Nan Nash ("Defendant Nash") from exercising jurisdiction over the case now pending before her, in violation of the Pueblo Plaintiffs' rights under the Fourteenth Amendment of the United States Constitution (Compl., Count I); and, (2) a declaration that the Indian Gaming Regulatory Act, 25 U.S.C. § 2701, *et seq*. "does not permit the shifting of jurisdiction from tribal courts to state courts over personal injury lawsuits brought against tribes or tribal gaming enterprises, for alleged wrongs arising or occurring within Indian country, and that thus the New Mexico state courts do not have jurisdiction over [the underlying state court litigation]."  (Compl., Count II).

## II.  Undisputed Facts and Applicable Gaming Compact Language

The following facts are undisputed and germane to the strictly legal issues raised by the motions for summary judgment.  Tamaya Enterprises, Inc. ("TEI") owns and operates the Santa Ana Star Casino ("Star Casino" or "casino").  TEI is wholly owned by the Pueblo of Santa Ana.

The Pueblo of Santa Ana is a federally recognized Indian tribe. The Star Casino is located on Santa Ana Pueblo lands, within the exterior boundaries of the Pueblo.

As explained in this Court's November 9, 2012 Memorandum Opinion (ECF No. 82 at 2), pursuant to the Indian Gaming Regulatory Act, on October 2, 2001,  the State of New Mexico and the Pueblo of Santa Ana entered into a Tribal-State Class III Gaming Compact ("the Compact")[1](ECF No. 51, Ex. A).   It permits TEI to operate the Star Casino on behalf of the Pueblo.  The negotiation process led to various provisions in the Compact.

As indicated in its title, the IGRA establishes a regulatory framework for Indian gaming. In 25 U.S.C. § 2710(d)(3)(C), the IGRA states the following, insofar as negotiation of compacts is concerned:

> (C)   Any Tribal-State compact negotiated under subparagraph (A)[2] may include provisions relating to --
>> (i)  the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;
>> (ii)  the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
>> (iii)  the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
>> (iv)  taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
>> (v)  remedies for breach of contract;
>> (vi)  standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
>> (vii)  any other subjects that are directly related to the operation of gaming activities.

---

[1]   The text of the Compact can be found at http://www.nmgcb.org/tribal/compacts.html.

[2]   This subparagraph (A) states:  "Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact *governing the conduct of gaming activities.*  Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact."  25 U.S.C. § 2710(d)(3)(A)(emphasis added).

Section 8 of the Compact, entitled "Protection of Visitors," reads, in pertinent part, as follows:

>    A.   Policy Concerning Protection of Visitors.  The safety and protection of visitors to a Gaming Facility is a priority of the Tribe, and it is the purpose of this Section to assure that any such persons who suffer bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise have an effective remedy for obtaining fair and just compensation.  To that end, in this Section, and subject to its terms, the Tribe agrees to carry insurance that covers such injury or loss, agrees to a limited waiver of its immunity from suit, and agrees to proceed either in binding arbitration proceedings or in a court of competent jurisdiction, at the visitor's election, with respect to claims for bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise.  **For purposes of this Section, any such claim may be brought in state district court, including claims arising on tribal land, unless it is finally determined by a state or federal court that IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court.**  (emphasis added)
>    …..
>
>    D.   Specific Waiver of Immunity and Choice of Law.  The Tribe, by entering into this Compact and agreeing to the provisions of this Section, waives its defense of sovereign immunity in connection with any claims for compensatory damages for bodily injury or property damage up to the amount of fifty million ($50,000,000) per occurrence asserted as provided in this Section.  This is a limited waiver and does not waive the Tribe's immunity from suit for any other purpose.  The Tribe shall ensure that a policy of insurance that it acquires to fulfill the requirements of this Section shall include a provision under which the insurer agrees not to assert the defense of sovereign immunity on behalf of the insured, up to the limits of liability set forth in this Paragraph.  The Tribe agrees that in any claim brought under the provisions of this Section, New Mexico law shall govern the substantive rights of the claimant, and shall be applied, as applicable, by the forum in which the claim is heard, except that the tribal court may but shall not be required to apply New Mexico law to a claim brought by a member of the Tribe.
>
>
>    E.  Election by Visitor.  A visitor having a claim described in this Section may pursue that claim in any court of competent jurisdiction, or in binding arbitration.  The visitor shall make a written election that is final and binding upon the visitor.
>
>    …..

### III.  Underlying State Court Litigation

Although the procedural history of this case has been set forth in two prior opinions of this Court (*see* ECF Nos. 43 and 82), for ease of reference, the Court will now briefly summarize the most relevant aspects of this history.  On July 9, 2006, Desiree Mendoza, Michael Mendoza, and Dominic Montoya attended a wedding reception at the Star Casino.  According to the state court complaint subsequently filed, Desiree and Michael Montoya were over-served alcoholic beverages by TEI, resulting in a one-car accident in which Desiree and Michael were killed, and their cousin, Dominic, was injured.

 The Personal Representatives for Michael Mendoza and Desiree Mendoza, and Dominic Montoya ("State Court Plaintiffs") filed the underlying state court action against TEI only, in Bernalillo County District Court. That wrongful death suit sought imposition of liability on the Star Casino for selling or serving alcoholic beverages to intoxicated persons.  It alleged that the casino's delivery of alcohol to Michael and Desiree, while they were obviously intoxicated, was in violation of Section 184 of the Pueblo Liquor Ordinance[3], and proximately caused their deaths.  The casino filed a motion to dismiss for failure to state a claim upon which relief could be granted, arguing that the plaintiffs could only bring their claims in tribal court and that the state district court lacked jurisdiction.  The Honorable Nan Nash granted the motion, dismissing the case.

On appeal, the New Mexico Court of Appeals disagreed, holding that Judge Nash had jurisdiction over the action based on the plain terms of Section 8(A) of the Compact.  *Mendoza v. Tamaya Enterprises, Inc*., 148 N.M. 534 (Ct. App. 2010).  While acknowledging that Section

---

[3] *See* 71 Fed. Reg. at 17,909, which provides a duty not to serve alcohol to intoxicated individuals, because of Section 191 of the Pueblo Liquor Ordinance, *id*. at 17,910.  Section 191 provides that any action premised on a violation of the Pueblo Liquor Ordinance "*shall* be brought in the Tribal Court of the Pueblo, which court shall have *exclusive* jurisdiction thereof."  *Id*. at 17,910 (emphasis added).

191 of the Pueblo Liquor Ordinance provided that all actions pertaining to its violation shall be brought in tribal court, the court of appeals characterized the underlying state court litigation as being a case for "damages based on wrongful death through negligence," as opposed to a claim under the Ordinance for breach of a duty not to sell alcohol to intoxicated individuals. *Id*. at 542. The court of appeals found that this negligence claim was covered by Section 8 of the Compact, and that entering into the Compact was an acknowledgement by the Pueblo that it waived its defense of sovereign immunity in connection with claims for compensatory damages for bodily injury or property damage, and that any claim could be brought in state district court. *Id*.

The New Mexico Supreme Court affirmed the court of appeals, finding that even though the Pueblo's Liquor Ordinance provided for exclusive jurisdiction in tribal court, "by virtue of Section 8 of the Compact, the Pueblo unambiguously agreed to proceed in state court for claims involving injuries proximately caused by the conduct of the Casino." *Mendoza v. Tamaya Enterprises, Inc*., 150 N.M. 258, 263 (2011). After making this jurisdictional determination, the supreme court proceeded to the merits of the Personal Representatives' wrongful death claims. The court ultimately concluded that the state court complaint stated sufficient facts to establish a third-party common law claim with respect to the passengers of the vehicle, as well as a patron claim with respect to the driver. *Id*. at 260-261. On June 27, 2011, the New Mexico Supreme Court remanded the case to state district court for further proceedings consistent with its opinion.

**IV.  Federal Court Litigation**

Four months later, the Pueblo Plaintiffs filed this matter in federal court. The relief sought in the complaint is explained above. An April 10, 2012 Memorandum Opinion (ECF No. 43) addressed motions to dismiss filed by the Defendants ("Federal Court Defendants" or "non-

tribal Defendants") in this case.  In that opinion, the Honorable Bruce Black declined to conclude that the *Rooker-Feldman* doctrine[4] barred the jurisdiction of this Court.  (*Id*. at 13).  He also held that the Pueblo's claim in this litigation for injunctive relief against Judge Nash is not cognizable, but that the claim against her for prospective declaratory relief is not barred, and remains a viable claim in this lawsuit.  (*Id.* at 17).

The Personal Representatives for Desiree and Michael Mendoza subsequently filed a motion for summary judgment based on the doctrines of res judicata and collateral estoppel. Judge Black's second Memorandum Opinion held that both of these doctrines were inapplicable (ECF No. 82).  Because the Pueblo was not a party to the state court litigation, Judge Black analyzed whether the Pueblo was in privity with TEI, which was a party in the underlying state court litigation.  Following a lengthy analysis, Judge Black concluded that the two parties were in privity for purposes of collateral estoppel (*id.* at 9-14), insofar as the legal issues that have been raised in this federal court litigation are concerned, based on the close relationship between Tamaya and the Pueblo with respect to Compact issues, and the identity of their interests with respect to the state-court jurisdictional issue.  In fact, Judge Black concluded that each entity's interest is identical, and that this interest is the same as TEI's interests in the underlying state court litigation. (*Id*. at 14).

In concluding that collateral estoppel nevertheless does not apply in this case, Judge Black noted that, although both the state and federal cases involve the issue of whether the state district court has subject-matter jurisdiction, the specific jurisdictional arguments raised by the Pueblo Plaintiffs in the federal litigation (*i.e.*, the legal efficacy of the tribal consent to state-court jurisdiction in Section 8 of the Compact, and the legal validity of *Doe v. Santa Clara Pueblo*,

---

[4] *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

141 N.M. 269 (2007)) were not discussed by either party in the underlying state court litigation or by the New Mexico appellate courts, following Judge Nash's dismissal of the case in state district court.  Accordingly, Judge Black concluded that neither of the Pueblo Plaintiffs has yet actually litigated these issues; therefore these issues, that have been raised only in the federal forum, were not "actually litigated" in the underlying state court litigation; and, it would be unfair to apply collateral estoppel to prevent the Pueblo Plaintiffs from litigating these questions in this Court.  (*Id*. at 19).

Judge Black also refused to apply res judicata to preclude the claims in this litigation. His basis for this refusal was that the claim in this litigation (whether the IGRA allows states and tribes to shift jurisdiction over a visitor's personal injury suit) differs from those in the underlying state court litigation (wrongful death claims).  (*Id*. at 14, 20).

Following entry of those opinions, this case was transferred to the undersigned judge on December 28, 2012.


**V.  Arguments of the Pueblo Plaintiffs**

In this federal litigation, as set forth more fully in their Complaint, the Pueblo Plaintiffs ask this Court to enter a declaratory judgment regarding the IGRA's constraints on shifting of jurisdiction from tribal to state court.  They seek a ruling that Judge Nash lacks jurisdiction to hear the underlying lawsuit.

The Pueblo Plaintiffs make the following arguments.  First, they rely upon the sentinel case of *Williams v. Lee*, 358 U.S. 217 (1959), for the principle that tribal courts retain exclusive jurisdiction over lawsuits arising on tribal lands against tribes, tribal members or tribal entities. They contend that the *Williams* decision rests on the principle of inherent tribal sovereignty, and

that, absent a grant of jurisdiction by Congress, the States have no power to regulate the affairs of Indians on a reservation.  (Pls.' Mot. Summ. J., ECF No. 52 at 5 (citing *Williams*, 358 U.S. at 220)).  They argue that an attempted exercise of such jurisdiction by state courts directly undermines "the authority of tribal courts over Reservation affairs," and thus infringes on "the right of [the Pueblo] to govern [itself]." (*Id.* at 6 (citing *Williams*, 358 U.S. at 223)).  The Pueblo Plaintiffs contend that nowhere does the IGRA expressly permit the shifting of jurisdiction over private personal injury suits to state court, and that this is the real crux of the matter.  (*Id*. at 11).  Specifically, they assert that no provision of the IGRA permits a transfer of jurisdiction from tribal to state courts, based upon an agreement in a compact, and that consequently the *Williams* rule of exclusive tribal jurisdiction controls.

The Pueblo Plaintiffs set forth the relevant portions of Section 8(a) of the Compact. Relying on the Report of the Senate Indian Affairs Committee,[5] they argue that relevant legislative history shows that the IGRA jurisdiction-shifting provision is solely directed at concern over possible criminal infiltration of tribal gaming; that the state's role was strictly limited to the regulation of class III gaming; and that Congress did not intend the IGRA as an invitation to any broader assertions of state authority in Indian country. (Pls.' Mot. Summ. J., ECF No. 52 at 14-17).

They argue that the extension of state court jurisdiction, and the application of state laws, as provided by the IGRA, were not contemplated by Congress for any purposes other than the regulation of class III gaming, and that the specific terminology in 25 U.S.C § 2710(d)(3)(C) does not indicate that Congress contemplated a transfer to state courts of pre-existing tribal court jurisdiction over ordinary, private, civil causes of action that have no relation to the conduct of gaming, other than the fact that the cause of action arose on the premises of a gaming facility.

---

[5]   *See* SEN. REP. NO. 100-446 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071 ("the Report").

(*Id.* at 19).   They contend that the claims in the underlying state action have no bearing whatsoever on the licensing or regulation of class III gaming activities.

The Pueblo Plaintiffs' next argument is that, although in the *Doe* case the New Mexico Supreme Court was presented with the same issue which is now squarely before this Court, this Court should give that decision no deference, and should rule conversely.  (Pls.' Mot. Summ. J., ECF No. 52 at 21).   On the merits, they argue that the *Doe* court improperly disregarded the requirement of express congressional authority for allowing state court jurisdiction over Indian people and entities, and that an easy inference of such authority from vague passages in the IGRA legislative history ignores the strict language of the statute itself.   Furthermore, the Pueblo Plaintiffs criticize the *Doe* opinion for disregarding the language in the Report that specifically warns against using the compact device to achieve any unauthorized broadening of state power in Indian Country.   Finally, they stress that the New Mexico Supreme Court wrongfully rejected a canon of construction, under *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) (the so-called "Indian Canon"), under which statutes are to be construed liberally in favor of Indians, with ambiguous provisions construed to their benefit.   For all of these reasons, the Pueblo Plaintiffs urge this Court to disregard the *Doe* decision.

The Pueblo Plaintiffs close with the assertion that either a tribal court adjudication or arbitration will provide the State Court Plaintiffs with an effective remedy for resolution of their personal injury claims against the tribal entities in this case.

## VI.  Arguments of the Non-Tribal Defendants

The four non-tribal Defendants in this federal litigation are basically aligned in their arguments in favor of state court jurisdiction.[6]  These parties maintain that the IGRA contains no language that prohibits the Pueblo of Santa Ana from waiving its immunity and agreeing to the subject matter jurisdiction of the state court, pursuant to the relevant compact.  It is their position that there is no applicable statute, case or rule of law that requires congressional approval for a tribe to waive sovereign immunity, and that the IGRA does not contain such a requirement.  (Mendoza Defs.' Resp., ECF No. 65 at 5).  They cite *C & L Enterprises, Inc. v. Citizen Band of Potawatomi Indian Tribe*, 532 U.S. 411 (2001), and *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751 (1998), for the proposition that tribes do not need congressional approval to waive immunity and argue that the waiver of tribal immunity in the Compact, in this instance, is exceptionally clear.

The Mendoza Defendants note the shortage of case law in this area, either in support or in opposition to their position that visitor tort and personal injury claims are within the scope of statutorily permitted areas of compact negotiations under the IGRA.  (Mendoza Defs.' Resp., ECF No. 65 at 9-12).  In support of their position that the IGRA permits states and tribes to negotiate jurisdictional shifting, from tribal court to state court, as it pertains to visitors' personal injury claims, they rely on the *Doe* case as well as upon *Muhammad v. Comanche Nation Casino*, No. CIV-09-968-D, 2010 WL 4365568, at *9 (W.D.Okla. Oct. 27, 2010).[7]

The Mendoza Defendants point out that § 2710(d)(3)(C)(vii) allows tribes to enter into compacts that could include provisions relating to "any other subjects that are directly related to

---

[6] Although he did not file a separate response to the Pueblo's motion for summary judgment, on July 2, 2012, Defendant Dominic Montoya filed a notice of joinder in the response of both the Mendoza Defendants and of Defendant Nash (ECF No. 66).

[7] These two cases, which have no precedential effect on this Court, conducted similar analyses, which, as is explained below, have been rejected by this Court in favor of its statutory construction analysis of the IGRA.

the operation of gaming activities." They urge the Court to interpret this subparagraph to mean that "other subjects" directly related to the operation of gaming activities includes personal injury claims.

They also refer the Court to the Report of the Senate Indian Affairs Committee, arguing that the IGRA's legislative history supports jurisdiction-shifting:

> In the Committee's view, both State and tribal governments have significant governmental interests in the conduct of class III gaming. States and tribes are encouraged to conduct negotiations within the context of the mutual benefits that can flow to and from tribes and states. This is a strong and serious presumption that must provide the framework for negotiations. A tribe's governmental interests include raising revenues to provide governmental services for the benefit of the tribal community and reservation residents, promoting public safety as well as law and order on tribal lands, realizing the objectives of economic self-sufficiency and Indian self-determination, and regulating activities of persons within its jurisdictional borders. A State's governmental interests with respect to class III gaming on Indian lands include the interplay of such gaming with the State's public policy, safety, law and other interests, as well as impacts on the State's regulatory system, including its economic interest in raising revenue for its citizens.

1988 U.S.C.C.A.N. 3071, 3083.

The Mendoza Defendants argue that, because a compact is a creature of contract law, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 49 (1996), and because Section 8 is not prohibited by the IGRA, the Pueblo's waiver of sovereign immunity is valid and meets the clarity requirements for such waivers. Accordingly, they contend that their underlying state court case is a legitimate and valid exercise of state court jurisdiction under the Compact. (Mendoza Defs.' Resp., ECF No. 65 at 14-15). They argue that the *Williams* case and its progeny are inapplicable in the face of this authorized, valid and clear waiver of immunity, which should be upheld.

Judge Nash characterizes the Compact as a contract that was expressly authorized by federal law, which contains a waiver of immunity and submission to state-court jurisdiction in

one simple section.   She argues that the Compact explicitly contemplates the allocation of jurisdiction between state and tribal courts and that, in entering into this Compact, the Pueblo had the power to agree to the jurisdiction-shifting provision in Section 8(a).   (Nash Resp., ECF No. 56 at 3-6).   In response to the Pueblo Plaintiffs' argument that shifting of jurisdiction to state courts, as provided for by the IGRA, was contemplated by Congress only for purposes related to regulation of class III gaming, she argues that regulation of the service of alcohol and its potentially dangerous interactions with gaming activity, are in fact, directly related to, and necessary for, the regulation of gaming activities.   (*Id.* at 11).

## VII.  Analysis

The IGRA is a federal statute, the interpretation of which presents a federal question, suitable for determination by a federal court.   It is on this basis that this Court will exercise its jurisdiction in this matter.   *See Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1548 (10th Cir. 1997).   This Court recognizes that in *Doe v. Santa Clara*, the New Mexico Supreme Court ruled on the same issue now before this Court and concluded that the state district court had jurisdiction in that case.   While federal courts must defer to a state court's interpretation of its own law, *Terminiello v. City of Chicago*, 337 U.S. 1 (1949), federal courts owe no deference to a state court's interpretation of a federal statute.   *United States v. Miami University*, 294 F.3d 797, 811 (6th Cir. 2002).   *See also Seneca-Cayuga Tribe of Okla. v. Oklahoma*, 874 F.2d 709, 712-13 (10th Cir. 1989)(noting that "federal law, federal policy, and federal authority are paramount in the conduct of Indian affairs in Indian Country").

Generally, absent clear federal authorization, state courts lack jurisdiction to hear actions against Indian defendants arising within Indian country.   *See* COHEN'S HANDBOOK OF FEDERAL

INDIAN LAW § 7.03[1][a][ii] at 609 (Nell Jessup Newton ed., 2012)("COHEN'S HANDBOOK"). The seminal United States Supreme Court decision concerning state civil adjudicatory authority in Indian country is *Williams v. Lee*. *See* AMERICAN INDIAN LAW DESKBOOK at 266 (U.PRESS OF COLO. 2008). In *Williams,* Hugh Lee, a non-Indian, brought suit in Arizona state court against Paul Williams, who was a Navajo Indian. Williams purchased goods at Lee's store on the reservation and failed to pay for them. Williams argued that exclusive jurisdiction lay in the tribal courts and the Supreme Court agreed. Noting that Navajo courts exercise broad criminal and civil jurisdiction, which covers suits by outsiders against Indian defendants, the Court found that it was "immaterial that respondent is not an Indian. He was on the Reservation and the transaction with an Indian took place there." *Williams*, 358 U.S. at 222.

*Williams* stated that, unless changed by "governing Acts of Congress," tribal courts retain exclusive jurisdiction over claims arising on tribal lands against tribes. (*Id*. at 220). Congress may authorize jurisdiction over such a suit to a state court. *See South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998)(noting that "Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights").

The exclusive jurisdiction of tribal courts may also be shifted to state court by a valid, clear tribal waiver of immunity, under certain circumstances. "As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 754 (1998)(citations omitted).[8] At this juncture, this Court must decide if either of these prerequisites to state court jurisdiction is present in this case.

---

[8] In *Kiowa Tribe*, the Supreme Court noted that "Congress has acted against the background of our decisions. It has restricted tribal immunity from suit in limited circumstances. *See, e.g.*, 25 U.S.C. § 450f(c)(3)(mandatory liability insurance); §2710(d)(7)(A)(ii)(gaming activities)."

### A.  Congressional Enactment of the IGRA

The first inquiry before the Court is whether Congress, by way of the IGRA, has authorized tribes and states to agree to shifting jurisdiction from tribal court to state court, thereby allowing the state to exercise jurisdiction over tribal defendants in visitors' personal injury lawsuits arising on Indian land.  For the reasons that follow, the Court concludes that the IGRA does not permit such a jurisdictional shifting.

### 1.  Purpose of the IGRA

To consider this issue in the proper context, the Court must examine the IGRA's purpose. Its first stated purpose is to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.  *See* 25 U.S.C. § 2702(1).  Its second stated purpose is to provide a statutory basis for the regulation of gaming by an Indian tribe, adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gambling operation, and to assure that gaming is conducted fairly and honestly by both the operator and players.  *See* 25 U.S.C. § 2702(2).  The third and final declared purpose of the IGRA is to declare as necessary the establishment of independent Federal regulatory authority, Federal standards and a National Indian Gaming Commission – all to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue. *See* 25 U.S.C. § 2702(3).  In short, the three stated purposes of the IGRA solely relate to operation, regulation and oversight of Indian gaming.  *See Seminole Tribe of Florida*, 517 U.S. at 48 ("Congress passed the Indian Gaming Regulatory Act in 1988 in order to provide a statutory basis for the operating and regulation of gaming by Indian tribes.")

**2.  Scope of Negotiation of Compacts Allowed Under the  IGRA**

The next step of this Court's analysis is to review the permissible subjects of negotiation, in determining whether the compact in question is within the confines of the IGRA.

The relevant portions of the statute state that

(C)    Any Tribal-State compact negotiated under subparagraph (A)[9] may include provisions relating to –

> (i)  the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of [class III gaming activity];
> (ii)  the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations; . . .
> (vii)   any other subjects that are directly related to the operation of gaming activities.

25 U.S.C. § 2710(d)(3)(C)(i), (ii) and (vii).

 "In determining the scope of a statute [the court] look[s] first to its language."  *United States v. Silvers*, 84 F.3d 1317, 1321 (10th Cir. 1996)(quoting *United States v. Turkette*, 452 U.S. 576, 580 (1981)).  According to its plain language, the scope of this section of the statute is to set forth provisions that may be negotiated, to be included in class III gaming activity compacts. The IGRA limits permissible subjects of negotiation in order to ensure that tribal-state compacts cover only those topics that are related to the conduct of gaming activities, and are consistent with the IGRA's stated purposes.

Subparagraph (ii), the only subparagraph in this section of the statute that mentions jurisdiction, permits an allocation of jurisdiction between the State and the Indian tribe, only as necessary for the enforcement of laws and regulations of the State or Indian tribe, that are directly related to, and *necessary for, licensing and regulation* of class III gaming activities. The Court finds no justification for concluding that the IGRA intends the extension of state court

---

[9] For content of subparagraph (A), see footnote 2, *supra*.

jurisdiction for any other purpose than resolution of issues involving the licensing and regulation of class III gaming.  A personal injury claim arising from the negligent serving of alcohol has no bearing whatsoever on the licensing or regulation of class III gaming activities.  Regulation of the service of alcohol does nothing to further the IGRA's three stated purposes.

Having read all of the legislative history cited to it by both parties, and in many other reported cases, the Court finds no support in the legislative history of the statute, sufficient to persuade it that the claim in the underlying state court litigation is within the categories of issues that may be allocated to state court jurisdiction.  For each statement contained in the legislative record on one side of the issue, the Court has found a countervailing statement.  For example, in the Report of the Senate Indian Affairs Committee at 3083, cited by the Mendoza Defendants, in discussing the strong and serious presumptions that must provide the framework for negotiations, such factors as "promoting public safety as well as law and order on tribal lands" are mentioned immediately prior to "realizing the objectives of economic self-sufficiency and Indian self-determination, and regulating activities of persons within its jurisdictional borders."  Given the ambiguity and randomness of parsing through and placing absolute reliance on isolated portions of legislative history, the Court has opted instead to rely on the clear statutory language and structure of the IGRA. *See Colorado River Indian Tribes v. National Indian Gaming Comm*., 383 F.Supp.2d 123, 139 (D.C.Cir. 2005)("The statutory language and the structure of the IGRA are clear, and so resort to the legislative history of the statute is unnecessary.").[10]

Congress could have worded subparagraph (ii) in a way that obviously or necessarily included a shifting of jurisdiction over such claims as the one in the underlying state court litigation, as a permissible topic for negotiations of compacts.  It did not do so. Even allowing

---

[10]   Furthermore, even if there were any ambiguity in the statute, it would have to be interpreted most favorably toward tribal interests.  *Blackfeet Tribe of Indians*, 471 U.S. at 766.

that there are many issues to be resolved in negotiating compacts, the IGRA takes a narrow view of what jurisdiction shifting may occur, and the language it employs is restrictive rather than expansive.

Furthermore, despite Defendants' arguments to the contrary, this Court concludes that the fact that this statutory language does not expressly *prohibit* jurisdiction-shifting, is irrelevant.  To conclude otherwise would be contrary to the explicit language of § 2710(d)(3)(C) and to the *Kiowa* case, where the Supreme Court stated that one of two prerequisites which would subject an Indian tribe to suit is "where Congress has **authorized** the suit."  *Kiowa*, 523 U.S. at 754 (emphasis added).  What is essential to this Court's analysis is a determination of the legal significance of what the statute actually says, i.e., what provisions may be included in class III gaming compacts.  The language and structure of this section of the statute indicate that it is exhaustive, in its list as to what is permitted, as indicated even by its limitation in subparagraph (vii) to those subjects that are "directly related to the operation of gaming activities."  The IGRA does not authorize states to exercise subject matter jurisdiction under the circumstances present in this case, and consequently this Court concludes that the Pueblo's exclusive jurisdiction over the claims in the underlying state court litigation must prevail.

### B.  Waiver of Immunity in the Compact

As the second prong of its analysis, it is incumbent on the Court to determine whether the language in Section 8 of the Compact can be construed as a legally effective waiver of immunity and an agreement, by the Pueblo, to be subject to state court jurisdiction in the underlying state court litigation.

The IGRA enacted the notion of a compact, which is essentially a contract between the states and tribes.  A gaming compact is a creation of the IGRA, which determines the compact's effectiveness and permissible scope.  *See Seminole Tribe of Florida*, 517 U.S. at 49.  The State and Pueblo entered into the Compact, pursuant to the IGRA.

As noted above, the stated scope and purposes of the IGRA solely relate to the operation, regulation and oversight of Indian gaming.  The Court's conclusion in Section VII(A) above, that the IGRA does not authorize jurisdiction-shifting in the underlying state litigation, is not affected in any way by the language of the Compact.  Section 8 of the Compact is nothing more than an agreement between the parties, the negotiated scope of which is controlled by § 2710(d)(3)(C).

While there is sparse case law that addresses this precise issue, the Tenth Circuit has addressed the issue of tribal waiver of immunity under the IGRA, on a couple of occasions.  The first case is *Mescalero Apache Tribe v. New Mexico*, 131 F.3d 1379, 1385-1386 (10th Cir. 1997), a case filed by the Apache Tribe of the Mescalero Reservation, seeking to compel the State of New Mexico to negotiate in good faith to achieve a compact permitting class III gaming. In deciding that case, the Court noted that "it appears the majority [of cases] supports the view that IGRA waived tribal sovereign immunity in the narrow category of cases where compliance with IGRA's provisions is at issue and where only declaratory or injunctive relief is sought."

This majority view (that the IGRA waived tribal sovereign immunity only in the narrow category of cases where compliance with IGRA's provisions is at issue), was mentioned again recently by the Tenth Circuit in *Santana v. Muscogee (Creek) Nation*, No. 12-5046, 2013 WL 323223 (10th Cir. Jan. 29, 2013)(*unpublished order and judgment cited pursuant to* 10th Cir. R. 32.1(A)(holding based on Oklahoma compact that tribal immunity was not waived for civil tort suits brought in state or federal court).  *Santana* quoted the above-cited  language from

*Mescalero* and also noted that "[t]he IGRA only authorizes the extension of state jurisdiction to enforce criminal and civil laws and regulations 'directly related to, and necessary for, the licensing and regulation' of tribal gaming activities.  25 U.S.C. § 2710(d)(3)(C)(i).'" *Santana*, 2013 WL 323223, at **2.  The limited case law in the Tenth Circuit supports this Court's restrictive interpretation of the IGRA and conclusion that a waiver of tribal sovereign immunity, in a compact entered into pursuant to the IGRA, can be valid only in the narrow category of cases where compliance with the IGRA's provisions is at stake.[11]

For these reasons, the non-tribal Defendants' effort to invoke Section 8 of the Compact as a basis for state-court jurisdiction in this matter fails.  "The IGRA limits permissible subjects of negotiation in order to ensure that tribal-state compacts cover only those topics that are related to gaming and are consistent with IGRA's stated purposes. . . ."  *Rincon Band of Luiseno Mission Indians v. Schwarzenegger*, 602 F.3d 1019, 1028-29 (9th Cir. 2010).  The language in Section 8 of the Compact cannot bootstrap the claims in the underlying state court litigation as coming within the scope of § 2710(d)(3)(C)(i), (ii) or (vii).  Simply put, the negotiated terms of the Compact cannot exceed what is authorized by the IGRA.

## VIII.  Conclusion

The Court hereby enters a declaration that the Indian Gaming Regulatory Act, 25 U.S.C. § 2701, *et seq.* does not authorize an allocation of jurisdiction from tribal court to state court over

---

[11] Of course the Court is cognizant that, under other circumstances, where congressional action affecting tribal rights is not involved, the Supreme Court has recognized valid, clear tribal waivers of immunity, leading it to conclude that state courts had subject matter jurisdiction.  *See* COHEN'S HANDBOOK, § 7.05[1][c] at 643-44; *C & L Enterprises*, 532 U.S. at 423 (Court found a clear waiver of tribal sovereign immunity and state court jurisdiction, based on a contract's choice-of-law and arbitration provisions).  In contrast, in this instance the Pueblo negotiated the Compact in accordance with the IGRA, and thus, there can be no clear tribal waiver of immunity for matters outside the scope of the IGRA.  Notably, the Pueblo recognized the limitations of its powers to waive immunity outside the scope of the IGRA in the Compact itself, in Section 8A("any such claim may be brought in state district court, including claims arising on tribal land, *unless* it is finally determined by a state or federal court that IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court."  (emphasis added).

a personal injury claim arising from the allegedly negligent serving of alcohol on Indian land and further that the New Mexico State District Court does not have jurisdiction in the case of *Gina Mendoza, Michael Hart and Dominic Montoya v. Tamaya Enterprises, Inc., d/b/a Santa Ana Star Casino*, CIV 2007-005711.

The IGRA only authorizes states to acquire limited civil jurisdiction over Indian casinos via the tribal-state compacting process for the purpose of licensing and regulating gaming activities. The limited scope for allocation of jurisdiction between the State and Indian tribe under the IGRA is narrow, confined to such issues of licensing and regulation. The underlying state court litigation does not involve issues of licensing or regulation of Indian gaming activities, or compliance in these respects, with the IGRA. For these and all reasons stated here, the Court hereby declares that that the New Mexico state court has no jurisdiction over the underlying state court litigation.

The Court specifically restricts its Declaratory Judgment to the type of personal injury claim involved in the underlying state court case (*i.e.*, a claim arising from the allegedly negligent serving of alcohol on Indian land). The Court finds it sufficient to make this limited ruling, as this limited declaration provides full relief for Plaintiffs as to the actual claim or controversy at issue. Because this Judgment falls short of the relief sought by the Pueblo Plaintiffs[12], Plaintiffs' Motion for Summary Judgment (ECF No. 52) is **granted in part and denied in part.** Furthermore, Defendant Mendozas' Second Motion for Summary Judgment (ECF No. 73) is **denied**.

---

[12] The relief sought by the Pueblo Plaintiffs in their motion for summary judgment is a ruling that the IGRA does not permit the shifting of jurisdiction from tribal court to state court over *all personal injury claims* arising from alleged wrongs arising or occurring within Indian Country.

**WHEREFORE, IT IS HEREBY ORDERED** that the above-stated partial declaratory judgment is entered and that the New Mexico State District Court does not have jurisdiction in the case of *Gina Mendoza, Michael Hart and Dominic Montoya v. Tamaya Enterprises, Inc*., *d/b/a Santa Ana Star Casino*, CIV 2007-005711.

**IT IS FURTHER ORDERED** that, because all matters in this lawsuit have been resolved, this matter is **dismissed with prejudice.**

_____
**SENIOR UNITED STATES DISTRICT JUDGE**